This case is 4-7-2-0-8-7, Havana Amusement v. The Workers' Compensation Commission. Counsel, you may proceed. May it please the Court, Glenn Blackman here on behalf of the appellant, Havana Amusement. This is our appeal of the Circuit Court's decision reversing a decision of the Commission as against the manifest ways of the evidence. It's within the province of the Commission to evaluate the facts, determine the credibility of witnesses, and weight the conflicting medical evidence. If you look at the Commission's decision, this is exactly what they did. The appellant submits that the Commission's decision in this matter was correct, supported by the evidence presented at trial, and we respectfully request that the Circuit Court decision be reversed and the Commission decision reinstated. Now, there are two main issues presented on this appeal, and the first is the Commission's finding regarding the alleged manifestation date. The Commission reviewed the appellee's testimony and medical evidence regarding the manifestation of the alleged bilateral carpal tunnel and left cubital tunnel syndrome and determined that she failed to prove that she sustained the condition which manifested on March 15, 2011. I'd note that the medical evidence shows diagnosis in March of 2011 only of two cure veins on the left with no right-hand symptoms diagnosed, no condition diagnosed, no symptoms reported. There's also inconsistencies within the record as to when these alleged conditions manifested. There are some, and the Commission noted this in their findings, that the appellee described symptoms going back four months. There's also reports of the symptoms in the left hand at least going back to 2009. But regardless, the only concrete diagnosis would be an EMG in March of 2012, which is months after she had stopped working for the appellant in this matter. And furthermore, I'd like to note that the Commission evaluated and reviewed her credibility and found her credibility lacking, especially regarding the complaints of the symptoms. There's also, apart from the symptoms, issues with her testimony regarding work activities that she was completing, that she testified that she was not working and was unemployed between June of 2011 and December of 2011. That was rebutted and she admitted that. Who is Kimberly Larson, counsel? Kimberly Larson is the, I believe, was the owner before she took over for Kimberly Larson Total Fitness or Total Spa and Fitness. And she testified at trial that during that time period when she said she was on unemployment, she was working for a three-day school. Was her testimony consistent and supportive of the petitioner? It was not, Your Honor. It was not? I do not believe so. Because she's, petitioner is testifying, this is something noted by the Commission, that she's not working at all during this time period. And yet, Ms. Larson comes in and states, you know, she's working three days a week as a cosmetologist, the same job that she was working before for the appellant. And did Dr. Trudeau support the claimant's position? I'm sorry? Did Dr. Trudeau support the claimant's claim? Well, I think Dr. Trudeau, who was, I believe, the one who completed the EMG, which was completed in March of 2012, she had bilateral carpal tunnel and cubital tunnel syndrome. But that wasn't until March of 2012. So how did the Commission air them? What if they go off the rails in their decision? I don't believe the Commission did go off the rails. I mean, the arbitrator. I took the court. Well, I think, referencing the circuit court specifically, and I'm not going to argue. Keeping in mind, we review the Commission's decision. We all know that. I understand. I won't belabor that point. But to summarize the evidence here. I think that there are a number of different things that the circuit court looked at, and with all due respect, given to the circuit court judge, that were, I want to say, I don't want to say improper, but it was really the wrong analysis. One, I think he, first and foremost, he reweighed the evidence. I think he looked at the Commission's decision, and instead of applying the manifest case there, even though he references it, I think he really evaluated the testimony, the petitioner's testimony, as well as the testimony of the physicians in this matter, and reweighed that evidence. I also note that there was reference, and I believe it's the Van Pruyen decision, which is a decision of the Social Security, in regards to the Social Security disability benefits, that I don't believe has any application to evaluating conflicting medical opinions under the Only Workers Compensation Act. So, in essence, you're saying there was sufficient evidence in the record to support the Commission's decision, the circuit court reweighed the evidence, and essentially substituted its judgment for that of the Commission. Correct. Is that the gist of your position? That is the appellant's position in this matter. Well, conceptually, let's look at this. We always say, oh, the circuit court reweighed the evidence. It's not supposed to do that. It's supposed to look at whether or not the opposite conclusion would be clearly apparent from that, that the Commission arrived at, right? I mean, that's usually what we say the circuit court is supposed to do, upon review of the Commission's decision. Correct. And they're supposed to look – they're only supposed to reverse the decision of the Commission if it's clearly apparent, the opposite result. There's no facts within the records which justify the Commission's findings. So they're not to look at what underlies the finding of facts made the basis foundation? I think they can look – obviously, they're allowed to look at all the facts in the case. But I think in this case, the way the judge was looking at it was reweighing the – Explain to me. What is reweighing? I'm struggling with that. I'm talking about – we throw that around a lot. I think he's making his own determinations, substituting as to the credibility and the weight which the Commission had assigned to the medical evidence as well as the petitioner's – sorry, the appellee's testimony. And how do you define the credibility and the weight that's being assigned by the Commission to this evidence? Based on the testimony and the evidence presented to us. Any evidence? Any support at all? If there's any – it's our contention that there's any support at all for the Commission's decision that the decision should be – Well, the better opinion gives you that support, doesn't it? I believe so. And that's really the second basis for the Commission's decision in this matter is that the petitioner, the appellee, had failed to prove that her condition of well-being was causally related to her work activities for the appellant in this matter. And the Commission was presented with two medical opinions, conflicting medical opinions. It is within their – I guess – They didn't just throw a dart at the board. They gave you reasons why they believe that her overrode. Correct. And I think it's very succinctly and accurately stated within the Commission's decision in this matter. The one thing to be careful about, though, you use the phrase, any evidence to support the Commission's decision. The test is sufficient. Any evidence, be careful with that phrase. Yes, Your Honor. And the Commission looked at these competing medical opinions and that's something that they're uniquely qualified to do. And they found the opinions of Dr. Bender to be more persuasive than the opinions of Dr. Brody. And they enunciated in their decision the reasons why they found the various opinions to be more – one opinion to be more persuasive than the other. They cited Dr. Bender's opinion. Dr. Bender, as they noted, is a hand surgeon specifically, upper extremity surgeon. And Dr. Bender reviewed the appellee's job responsibilities as a cosmetologist and determined that, one, the job activities were not going to cause any structural change in the elbow. And two, in order for these job activities to cause carpal tunnel syndrome, you would need forceful and repetitive activities over the course of the work day, which just was not present as the testimony at trial reveals. The job tasks the appellee was performing were varied over the course of the work day. Hair cutting, coloring, permanence, shampooing, massaging, brushing, manicures, pedicures, and the list goes on. So she was varying her activities and it just didn't rise to the level of forceful and repetitive activities to cause carpal tunnel syndrome. And the Commission found this opinion to be persuasive. On the other side, the Commission looked at the opinions of Dr. Brody and did not find them persuasive for several reasons. And foremost upon them is the representations, which I believe were provided by appellee's counsel to Dr. Brody, that she was performing 70,000 repetitions per day. And if you do the math on that, and I think we enunciated in our decision, that's like 2.4 repetitions per second. Unbelievably fast and clearly an exaggeration, which the Commission thought so. And this was the basis for Dr. Brody's opinions. Frankly, he's relying on evidence and statements that are just not true. And also he admitted that there's an EMG. And where did those statements come from? I believe that they came from, and I need to look at the record, but I believe that they came from appellee's counsel. From appellee herself. That 70,000 repetitions is what she's doing. So there's no testimony to that? I think she also testified in the trial to being 70,000 repetitions. Who's she that testified? The appellee. Oh, yeah. Okay, so there is an appellee's statement. Correct. That's evidence. But it's just not believable. Well, in any event, it's up to the Commission to determine the weight and the credibility of the evidence. In this case, it went against the petitioner. And in essence, there's sufficient evidence, you reckon, correct? That is my argument, correct. And based on the arguments that I've made, we request that the Circuit Court's decision be reversed and the Commission's decision be reinstated as if it's not against the manifest evidence. Thank you. Thank you, Counsel. We have time for reply. Counsel, you may respond. May it please the Court, Counsel Hania Sohail representing the appellee. Just brief background, Your Honors. This is a case where the petitioner or the appellee worked as a cosmetologist and a nail technician for the respondent. She was employed for approximately over six years. She was working as a nail technician, half of her job, and cosmetologist, half of her job. Sohail, can I jump in with a point of question? Sure. I noticed that in the brief, the claimant relies on the strength of her own testimony, but it appeared that the claimant, in the Commission's opinion, lacked credibility. I'd like you to hone in. They pointed out that there were several inconsistencies between her testimony and the evidence. For example, claimant testified that she began experiencing pain, tingling, and numbness in both hands and wrists in the fall of 2010, and that she sought treatment for the symptoms on March 15, 2011. The medical records, first of all, showed she denied experiencing numbness and only complained of left wrist pain, with no complaints regarding her right wrist or left elbow on March 15, 2011. The Commission also noted that the claimant acknowledged, this is interesting, authorizing certain Facebook posts that directly contradicted her testimony. And Ms. Bergman testified that the claimant did not relate her wrist conditions to work on March 15, 2011, which directly contradicted her testimony before the Commission. So what I'm getting at is, what do we do with the Commission's findings that there was some credibility problems with the claimant's testimony? And, Your Honor, I cannot respond to this more eloquently than Judge Tucker did. Here's what the Commission did. The Commission cherry-picked and drew inferences that were not supported by the evidence. To respond to your question regarding claimant testified that she started having pain in fall of 2010, well, she did. That's what she testified to. She went and she saw the Dr. Wagner's PA, Sherry Turner. If you look at Dr. Turner's March 15, 2011 note, and you look at then a year later, April, I'm sorry, March of 23rd of 2012 of Dr. Wagner's note, Dr. Wagner's do not note that the right-hand symptoms or the left-arm symptoms are a new complaint. His medical records state she continues to have pain in both of her hands and left arm. She did at all times testify that her left-hand symptoms were predominant, that her left-hand symptoms were more than her left elbow and right hand. We all have seen that a lot of times when a petitioner goes to a medical provider, they are only focused on the main pain issue, and they tend to ignore, at least in the medical records, about the other body parts that somebody may be complaining of. With regards to the Facebook post, and I would like to correct counsel on that because I was there in trial, I've read the whole record, I've read the commission decision, I've read the arbitrary decision and circuit court decision. Kimberly Larson did not testify that she was working three days a week. Kimberly Larson is a gal. She was working at, I believe, the salon at that time before my client inquired and used to call, Totally Fit, and she was not the owner, and she was just a worker who would work there, and she would say, yes, Lori Smith, petitioner, would come there and hang out. She never said she worked there. So I don't know where exactly commission came up with the idea that she was working when we had unrebutted testimony, both from petitioner and an independent witness saying she never worked. So are you saying there were no inconsistencies at all between? I do not believe so, Your Honor. Even if you talk about, you talk about notice. Rachel Hearst, another witness, who said, I witnessed petitioner stating that she's having problems, and her problems are being associated with the job that she was performing. So I don't believe that there's any inconsistencies, and I think that is what the Honorable Tucker essentially noted, that the commission cherry-picked the fact that they went too deep into finding that she was not credible when the arbitrator who heard her testimony, who saw her testifying, found her to be credible. Well, the phrase cherry-picking is misleading because, I mean, you could say they cherry-picked and found inconsistencies, but the question to me more fundamentally is, were there inconsistencies? I do not believe, Your Honor, there were. Where did she get the idea she did 70,000 hand repetitions per day? There they are, I believe. And this was something that was contained in the job description that she authored. It was also contained in Dr. Rhodes' testimony. Correct. Where he indicated that his entire basis for his causation opinion was based upon the petitioner's statement that she did 70,000 hand repetitions per day. I just did the math. Your opponent is entirely correct. That's two-plus hand repetitions a second. I don't believe that, Your Honor, Dr. Rhodes' causation opinion was solely based on the amount of repetitions. Dr. Rhodes, during the index visit, I'm not talking about quantifying the repetition, did indicate what she did, did indicate the split up between her job as a cosmetologist, as a nail technician. He also reviewed two separate job descriptions, one that was authored by the petitioner herself, which was introduced at the time. Did he testify that he relied upon her representations, that she did 70,000 hand repetitions per day in formulating his opinion? I do not believe that that's how exactly he said, Your Honor. How exactly did he say it? What he said is he reviewed both job descriptions, one also authored by the employer themselves. And he said that he has reviewed the job descriptions, he has an understanding of the job that she performed at the respondent, and he believes that the job of the cosmetologist or a nail technician is a highly repetitive job. So he never mentioned the 70,000 repetitions? He did, Your Honor. Oh, he did? He did mention that. I thought we took a while to get that out of you, but go ahead. No, he did, Your Honor. Yeah. But his causation opinion is not based on the threshold of 70,000. How do we know that? Because he testified in different ways during his deposition as to why he believes that this lady's condition was related. He said, in general, based on what has been provided to him, her job is repetitive. Such a major group provided to him. Can you tell us that he didn't take that representation into consideration in formulating his causation opinion? Is that what you're telling me? I'm sure he did, but I don't believe that that was a sole codification. Why would it have to be the sole basis? You know, he testified, he admitted that the March 13th to 12th EMG could have arisen after she ended her employment, but stated that his causation opinion, relating it to the employment, was based upon 70,000 hand repetitions per day. And it's, I mean, it's physically impossible. That was one of the factors, Your Honor. He also talks about the dose response. He also talked about the fact that this lady was left-hand dominant. So why couldn't the commission rely on Vetter? Well, the commission actually did not rely on Dr. Rohde. Dr. Vetter? Dr. Rohde at all. No, the commission didn't rely on that? There was a... Want me to read it to you? The commission did, in their findings of facts, talk about Dr. Rohde. In their conclusions of law, and there was actually, during oral argument with Judge Tucker, there was a question made, and Judge Tucker was puzzled by the fact that how come in denying causation, they're relying on Dr. Vetter and don't even mention Dr. Rohde? They did mention Dr. Rohde. Commission finds the opinions of Dr. Vetter, a surgeon who specializes in hand surgeries, more persuasive than those of Dr. Rohde. Vetter opined that the petition's work with the respondent was not forcefully repetitive enough to have caused her condition. Then in the next paragraph, they said why they discounted Rohde's opinions. They said it was less persuasive than Vetter. Why? Because he admitted that his findings that the EMG could have arisen after she ended her employment and that he based his causation opinion on her representation and that she did 70,000 hand repetitions per day. So don't say that the commission did not consider Rohde as opposed to Vetter and choose Vetter. Dr. Vetter, in this particular case, did not even know exactly what she did. He did not have any idea. He admitted that he does not recall whether he discussed the petitioner's job duties with her when she was in. Let's be kind of clear here. I just read to you they relied on Vetter. Now you're trying to say they should not have relied on Vetter because he had an insufficient basis for his opinion that they could rely on. Yes, Your Honor. That's where we are right now. Because I am saying that the commission's decision in relying on Dr. Vetter is against the medical state of the issue. Now you accept that they did rely on Vetter, but they did in error, right? They always relied on Dr. Vetter. Oh, okay. I didn't hear that coming from you. My apology. I was talking about Dr. Rohde, that they did not rely on Dr. Rohde. Dr. Vetter's opinion on causation, they should not have relied on it. And they should not have relied on it because Dr. Vetter did not know what this lady did. He did not know. Wait a minute. That's true. If that's true, Rohde didn't know either. He thought she did 70,000 handwork petitions. So you've got two doctors, neither of which truly understand what this woman did. Isn't that a failure of proof? I would not agree with that, Your Honor. I'm sure you wouldn't. Go ahead. I don't believe that just because Dr. Rohde, if a petitioner gives a quantity and that quantity may not have happened, Dr. Rohde had three pages of one job description, four pages of another job description, along with other information that was noted by Dr. Rohde during his index visit. So he had an idea. He had a lot more ideas to what she did, what the breakdown was, how many hours she worked, what breaks and how many breaks she took than Dr. Vetter did. Dr. Vetter did not know anything about that. So how are you going to rely on a repetitive trauma case where the whole point of a surgeon is to see whether the condition is related to the job duties when the surgeon did not know what she did? Ms. Soha, let me ask you a point of question. We've been talking about, on both sides, I think you've articulated why there was a fundamental foundational problem with Vetter's testimony. We're going around and around. We keep hearing 70,000 hand repetitions a day. If that is physically impassable, and nobody's argued that it isn't physically impassable, doesn't that still, at the end of the day, go to the claimant's credibility? That alone would be the basis for undermining her credibility, wouldn't it, if she testifies to something that's physically impassable? How do you respond to that? I would say, Your Honor, you actually answered the question. I did? Well, you were asking me the question because, really, we may think this was impossible. We may think that the evidence doesn't show that this was impossible. Maybe she was – I have never worked as a cosmetologist or a pedicurist. I don't know how many repetitions you were doing when you were buffing the – you know, using a nail buffer or using the drill. So as it stands here right now, nobody – Hold on. The commission covered that issue, ma'am. Would you like me to read that to you, too? Even Dr. Rohde was aware Petitioner continued working as a cosmetologist through June 2012. The commission also finds Petitioner's claim of performing 70,000 hand repetitions per day while working for a respondent to be unsupported by evidence or even explanation. Given her one or two hours of downtime each day, as well as her various duties as shampooing and massaging clients' scalps, using electric clippers, blow-drying and combing hair, none of which entails 10,000 repetitions per hour as Petitioner reported to Dr. Rohde, Commissioner finds the Petitioner's figure exaggerated. And I believe, Your Honor, that Commission is speculating. And here's why Commission is speculating, because Vanessa Bergman – and I think she was part owner, she was the manager, she was the owner's wife – she was present during the time that Petitioner testified. Two plus repetitions a second? Every day? Ma'am, we all wash our hair. You don't make 2,000 – 2 1⁄2 repetitions a second even washing your hair. Forget about using a blow-dryer. I mean, the Commission has to use common sense once in a while, and I think they did this time. She exaggerated. You know, sometimes it's good to give in to the issues you can't win. I mean, there's no 70,000. She exaggerated the number of repetitions. They found her lacking credibility because of it. Your Honor, I don't believe that that was the only issue. They found her lacking credibility, and I think I believe I covered the other issues. They found her not credible. And the issues they found her not credible are not supported by the evidence. Okay. Well, let's stop for one second because one of the things that you had been asked earlier by one of the other justices was the Facebook post, and you answered that in regard to Kimberly Larson and something Kimberly Larson said. But on cross-examination, the claimant admitted that she had authored several Facebook posts indicating that she had started working at Head to Toe Fitness Salon, and that in, let's see, she authored one on July 25th, 2011, where she stated that she went to work at 7 a.m. at Totally Fit in Havana and gave a pedicure. But then she denied working at another salon and explained that her friend Kimberly Larson worked at Totally Fit. The claimant further explained that Larson had allowed the claimant to give occasional haircuts and pedicures to family members or acquaintances at Totally Fit. Now, this is her admitting this in deposition. The claimant initially stated that she did not charge for any of the services, though later she changed that and said she did accept donations to assist in purchasing Totally Fit. So, I mean, the Facebook post, her own Facebook post, and her own testimony and deposition with regard to what she did or didn't do changed multiple times. Doesn't that create a huge problem for her in regard to her credibility? I would disagree, Your Honor, and here's why I would disagree. And I would disagree based on the fact that I don't believe that she changed. I believe that I didn't ask during direct examination a lot of questions regarding her Facebook post. In fact, Facebook posts were introduced, if I'm not mistaken, during only cross-examination. So, what she said at all times was, yes, I would go hang out there. I did occasional pedicure or, you know, put a bar in the hair or things like that for people I knew or, you know, some friend's daughter. I did not accept any money. I did accept donations. In fact, she was on unemployment this whole time. She was not working. So, she was, even though people were donating for her because she was trying to essentially transform this salon into a salon that she was trying to buy in, but she did not work. Well, if she had admitted that she was working, then that would have been another issue of, you know, fraud too, right? But she wasn't working, Your Honor. Wait a minute. The admission says she admitted she was. She testified that during the six months after she left the respondent's employment, she didn't have a job, did not work anywhere, did not do repetitive work with her hands other than work around the house. But when the petitioner was confronted with evidence clearly showing that she was working during this time, she admitted that she had been. Is that wrong? They are wrong because she never admitted she had been. That is what Judge Zucker picked out on and said that this is against the manifesto of the evidence because it's not supported by the evidence. She never admitted that she was working. Your time is up. Are there any questions, Your Honors? I don't think there are any. Thank you. Counselor, you may reply. Thank you, Your Honor. I'll be brief. In response, I think the inconsistencies of her statements are pretty plain. The Commission, I should say, issues less than forthcoming about her work activities, other issues involved in the case, and they were right to discount her credibility. In addition, I just, for the record, that Dr. Brody did rely on these exaggerated reports. He's relying on 70,000 repetitions per day, which is just wrong, and he's not relying on her actual job duties. But job duties, which are just not repetitions, just can't be done. It's impossible. If there are no further questions, yes. I don't believe there are. Thank you, Your Honor. Thank you, Counsel. Both of your arguments in this matter have been taken under advisement. I've written this position down.